STATE OF CONNECTICUT *v.* VAN CLIFTON
MCKENZIE-ADAMS
(SC 17451)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 21, 2006—officially released February 27, 2007

*Richard Emanuel,* for the appellant (defendant).

*Bruce R. Lockwood,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Eugene Calistro, Jr.,* senior assistant state's attorney, for the appellee (state).

*Richard Blumenthal,* attorney general, and *Clare E. Kindall,* assistant attorney general, filed a brief for the state board of education et al. as amici curiae.

*Opinion*

BORDEN, J. The defendant, Van Clifton McKenzie-Adams, appeals[1] from the judgment of conviction, rendered after a jury trial, of thirteen counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (8).[2] The defendant raises four claims on appeal: (1) § 53a-71 (a) (8), which prohibits, inter alia, a teacher from engaging in sexual intercourse with a student enrolled in the school system in which the teacher is employed, violates the defendant's right

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we subsequently granted the defendant's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[2] General Statutes § 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and . . . (8) the actor is a school employee and such other person is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor . . . ."

General Statutes § 53a-65 provides in relevant part: "(2) 'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body.
* * *
"(13) 'School employee' means a teacher, substitute teacher, school administrator, school superintendent, guidance counselor, psychologist, social worker, nurse, physician, school paraprofessional or coach employed by a local or regional board of education or a private elementary or secondary school or working in a public or private elementary or secondary school."

of sexual privacy under the federal and state constitutions; (2) the trial court improperly consolidated two separate cases against the defendant for trial; (3) the trial court improperly admitted evidence of uncharged sexual misconduct to establish a common scheme or plan; and (4) the trial court improperly admitted constancy of accusation evidence. We affirm the judgment of the trial court.

In connection with two separate victims, the defendant was charged, in four informations,[3] with fourteen counts of sexual assault in the second degree in violation of § 53a-71 (a) (8). The trial court consolidated the

[3] In Docket No. CR02-0004040-T, the state charged the defendant with nine counts of sexual assault in the second degree in violation of § 53a-71 (a) (8). Counts one and two of the information charged that the defendant had engaged in sexual intercourse with the victim, P.L.; see footnote 4 of this opinion; in a motor vehicle parked in the "area of Goffe Terrace near Bellevue Street" in the city of New Haven on or about June 9, 2001. Counts three, four, seven, eight and nine of the information charged that the defendant had engaged in sexual intercourse with P.L. in East Rock Park, which is located in the city of New Haven, on various dates in July or September, 2001. Lastly, counts five and six charged that the defendant had engaged in sexual intercourse with P.L. in the "area of Whalley Avenue and West Park Street" in the city of New Haven on various dates in September or October, 2001. In Docket No. CR02-0004042, the state charged the defendant with two counts of sexual assault in the second degree in violation of § 53a-71 (a) (8). Count one of the information charged that the defendant had engaged in sexual intercourse with the victim, N.R., "in the area of East Rock Park" in July, 2001. Count two charged that the defendant had engaged in sexual intercourse with N.R. "in the area of Foote School, Loomis Place" in the city of New Haven in July, 2001. In Docket No. CR02-0180686-T, the state charged the defendant with two counts of sexual assault in the second degree in violation of § 53a-71 (a) (8). Count one of the information charged that the defendant had engaged in sexual intercourse with P.L. in the Fairfield University Library, which is located in the city of Fairfield, sometime between July 1 and August 31, 2001, and count two charged that the defendant had engaged in sexual intercourse with N.R. at the same location sometime in July, 2001. In Docket No. CR02-0007351-T, the state charged the defendant with one count of sexual assault in the second degree in violation of § 53a-71 (a) (8). Specifically, the state charged that the defendant had engaged in sexual intercourse with P.L. in the Whitlock Farms bookstore, which is located in the town of Bethany, sometime between July and August, 2001.

four cases against the defendant for trial, and the jury found the defendant guilty of all charges. Thereafter, the defendant moved for judgments of acquittal and, on April 14, 2004, the trial court granted the motion with respect to count four of the information in Docket No. CR02-0004040-T. See footnote 3 of this opinion. The trial court subsequently rendered judgments of conviction in accordance with the jury's verdict on the remaining charges, and this appeal followed.

The jury reasonably could have found the following relevant facts. From September, 2000, through October, 2001, the defendant was employed by the New Haven board of education as a Latin teacher at Hill Regional Career Magnet High School (Career School), which is a secondary school located in the city of New Haven. The first victim, N.R., was a student enrolled in Career School from September, 2000, through June, 2002, and the second victim, P.L., was a student enrolled in Career School from January, 2001, through June, 2002.[4]

In September, 2000, N.R. was sixteen years old[5] and a junior enrolled in the defendant's Latin class. At some point in the fall of that year, the defendant began to tutor N.R. in the subjects of Latin and math. N.R. would meet the defendant in the Career School library almost every school day to receive tutoring in these subjects. Eventually, the defendant and N.R. began to develop a personal relationship. N.R. began to confide in the defendant concerning her personal problems, such as her strained relationship with her mother. Likewise, the defendant began to confide in N.R. concerning his family and his relationship with his wife and his two

---

[4] In accordance with the policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[5] N.R.'s date of birth is June 20, 1984. Accordingly, N.R. was seventeen years old when she and the defendant first had sexual intercourse in July, 2001.

children. Although the defendant often embraced his female students, including N.R., the physical contact between the defendant and N.R. became more frequent and intimate as their personal relationship deepened. The defendant began to embrace N.R. more tightly and sometimes pinched her buttocks, even when other students were present. Additionally, the defendant often commented on N.R.'s physical appearance. For example, the defendant frequently told N.R. that she had an "outrageous body" and that she "shouldn't let it go to waste."[6]

One afternoon, while N.R. and her friend S.B. were in the back corner of the Career School library talking to the defendant, the defendant suddenly kissed N.R. on the lips. Although N.R. was surprised by the kiss, she enjoyed it and was flattered by the defendant's attention. Sometime thereafter, the defendant offered to give N.R. and S.B. a ride home from school. Both girls accepted the defendant's offer, and the defendant drove them to downtown New Haven, where he dropped S.B. off at a bus stop. The defendant then asked N.R. if she would like to go for a drive, and N.R. responded that she "didn't care, [because she] didn't have to be right home . . . ." The defendant drove N.R. to Long Wharf, which is located in the city of New Haven. The defendant and N.R. walked along the beach at Long Wharf, until they reached a secluded area, where they sat down on a nearby log. The defendant

---

[6] At the end of the school year, the defendant wrote the following inscription in N.R.'s copy of the *Spectrum*, a book of poetry edited and published by the students at Career School: "I am having difficulty writing this. You are quite special to me. And I have taken a keen interest in your life. I have to admit that you are my favorite student/person. You have an indelible will. An uncanny wit and an outrageous uhh—smile, yes that's it—smile. You have a permanent place in my heart [N.R.]. I shall always be at your disposal. Love, V." At the defendant's trial, N.R. testified that she understood the term "outrageous smile" to be a reference to her body or buttocks because the defendant often told her that she had "an outrageous body or a nice butt."

began to rub N.R.'s legs, and told her to sit on his lap. N.R. complied, and the defendant kissed her on the lips. The defendant proceeded to pull down the front of N.R.'s dress, revealing her breasts, and then kissed her breasts. N.R. "just kind of sat there and let him" kiss her for a few minutes. Afterward, the defendant dropped N.R. off near her home.

The defendant and N.R. continued to maintain a sexual relationship through the summer of 2001. One afternoon in July, 2001, the defendant drove N.R. to East Rock Park, which is located in the city of New Haven. While parked in the defendant's car, the defendant began to rub N.R.'s legs and to kiss her lips. At some point, he moved his hands beneath N.R.'s skirt, and began to rub her vagina over her underwear. The defendant eventually shifted N.R.'s underwear aside, and penetrated her vagina digitally. N.R. testified that she had "liked it" and had "let him do it." At another point in July, 2001, the defendant drove N.R. to Foote School, which is located in the city of New Haven. After parking his car on the street, the defendant began to rub N.R.'s legs and to kiss her lips, eventually moving his hands beneath her skirt and penetrating her vagina digitally. On another occasion, the defendant performed oral sex on N.R. in a secluded corner of the Fairfield University Library, which is located in the city of Fairfield. At some point in July or August, 2001, while the defendant and N.R. were parked in a car in the parking lot of East Rock Park, the defendant asked N.R. "when [she] was going to suck his dick," and she responded that she "wasn't going to." Thereafter, the defendant and N.R. discontinued their sexual relationship because N.R. had realized that "it wasn't right what was going on . . . ."

Meanwhile, on January 2, 2001, P.L., who was then sixteen years old,[7] enrolled in Career School as a junior.

[7] P.L.'s date of birth is September 6, 1984. Although P.L. was sixteen years old when she and the defendant first had sexual intercourse on June 9,

On her first day of school, P.L. was introduced to the defendant by a fellow student. At this first meeting, the defendant told P.L. that she was "a very pretty girl . . . ." Although P.L. was not a student in the defendant's Latin class, she often spent her free time in the Career School library, where the defendant's office was located. The defendant and P.L. soon began to meet in the library almost everyday, where they would talk about "everything," including P.L.'s dysfunctional relationship with her family and her relationship with her boyfriend. P.L. considered the defendant to be her counselor and friend. Indeed, whenever the defendant saw P.L., he would embrace her, hold her hand or kiss her on the cheek.

Sometime during the last week of classes at Career School in June, 2001, P.L. visited the defendant in his classroom. The defendant was sitting at his desk working on his computer, and P.L. sat down beside him. Although other students were present in the classroom, the defendant grabbed P.L.'s hand and intertwined his fingers with hers. P.L. began to flip through the defendant's daily planner, which was located on his desk, and immediately noticed a photograph of N.R. inside. The defendant explained to P.L. that N.R. had given the photograph to him, and chastised P.L. for her failure to do the same. At that point, the bell signaling the end of classes rang and the remaining students dispersed from the classroom. P.L. rose from her seat, and leaned forward to hug the defendant goodbye. The defendant embraced P.L. tightly, and proceeded to kiss her on the neck, the cheek and the lips. P.L. was shocked, surprised and amazed by the kiss.

During the summer of 2001, the defendant was employed as a math instructor in Aspirations for Higher

2001, she had attained the age of seventeen by the time she terminated her sexual relationship with the defendant, on or about October 24, 2001.

Learning (Aspirations), a six week long college prepara-
tory program administered by the New Haven Public
Schools. During this same time period, P.L. was enrolled
as a student in Aspirations. On the morning of June 9,
2001, the defendant picked P.L. up at her home and
drove her to the Aspirations orientation to take a place-
ment exam in connection with the Aspirations program.
After the exam, the defendant drove P.L. home, parking
his car some distance from her house.[8] The defendant
proceeded to kiss P.L. on the lips, to fondle her breasts
and buttocks, and to penetrate her vagina digitally.
Thereafter, the defendant unzipped his pants and
exposed his penis. The defendant told P.L., "I'm going
to make you do this," and he pushed her head toward
his penis. Although P.L. was surprised, she put the
defendant's penis in her mouth for a few seconds. After-
ward, as P.L. was leaving the defendant's car, he kissed
her goodbye and slapped her buttocks.

On another occasion in the summer of 2001, the
defendant drove P.L. to the Fairfield University Library.
The defendant explained to her that "libraries made
him horny," and directed her to a secluded corner on the
second floor of the library. The defendant proceeded to
kiss P.L. on the lips and to run his hands over her body.
The defendant then informed P.L. that it is "an honor
when a woman opens or spreads her legs out to a man
. . . ." In response, P.L. opened her legs, whereupon
the defendant unbuttoned his pants and penetrated her
vagina with his penis. Afterward, the defendant and P.L.
proceeded to the basement of the library, where they
again had penile-vaginal sexual intercourse.

At another point in the summer of 2001, the defendant
drove P.L. to the Whitlock Farms bookstore, which is

---

[8] P.L. testified that the defendant did not park directly in front of her
house because she and the defendant "always kissed good-bye and stuff
like that" and the defendant "didn't want [P.L.'s] father or anybody seeing
[her] being parked in front of the house."

located in the town of Bethany. After perusing the books, the defendant directed P.L. to a secluded hallway at the back of the store, where he lifted her skirt and penetrated her vagina with his penis.

During the summer of 2001, the defendant and P.L. also had sexual intercourse at East Rock Park on three separate occasions. On the first occasion, the defendant and P.L. walked to a secluded area of the park behind a large boulder, where they had penile-vaginal sexual intercourse. On the second occasion, the defendant drove P.L. to the summit of East Rock Park, where he and P.L. had penile-vaginal sexual intercourse in the defendant's parked car. On the third occasion, the defendant and P.L. returned to the sheltered area behind the large boulder, where P.L. performed oral sex on the defendant and had penile-vaginal sexual intercourse with the defendant.

Sometime after classes had commenced at Career School in August or September, 2001, the defendant suggested to P.L. that they should jog together on week-day mornings. P.L. agreed, and she arranged to meet the defendant the next day at approximately 6:15 a.m. at the Holocaust Memorial (memorial), which is located on Whalley Avenue in the city of New Haven. When P.L. arrived at the memorial as planned, the defendant told her that he wanted to show her something in the surrounding woods. P.L. and the defendant walked along a trail until they reached a secluded area in the bushes, where they proceeded to have penile-vaginal sexual intercourse. The defendant and P.L. continued to meet at the memorial nearly every morning until October 24, 2001. Although they jogged together occasionally, on most days, they had penile-vaginal sexual intercourse instead.

Although N.R. and P.L. were classmates, they were not friends. Indeed, the two girls avoided each other

throughout the spring and fall of 2001. This was because the defendant often told P.L. to steer clear of N.R. because she "hated [P.L.'s] guts" and likely would "kick [her] and throw [her] down the stairs . . . ." Likewise, the defendant often told N.R. that she and P.L. "wouldn't mix well because [P.L.] was kind of snotty . . . ." Despite the defendant's efforts, at some point in October, 2001, N.R. approached P.L. and said, "I don't like you, you don't like me, let's find out why we're not friends." The two girls began to talk, and soon discovered that the defendant had been maintaining a sexual relationship with each of them. Thereafter, N.R. and P.L. decided to confront the defendant with their newly acquired knowledge, and to inform school authorities about the defendant's behavior.

On October 24, 2001, when N.R. and P.L. confronted the defendant in the Career School library, the defendant admitted that he had had sexual intercourse with P.L. After P.L. became very upset, N.R. escorted her out of the library into the hallway. At that point, A.D., a friend of P.L.'s, persuaded both N.R. and P.L. to inform the school authorities of the defendant's misconduct. The three girls proceeded to the nurse's office, where A.D. asked the school nurse, Allison Daley, whether a student should report a sexual relationship with a teacher. Daley responded that "it should be reported because no teacher or any faculty should be having any kind of relationship with a student that is sexual" in nature. Thereafter, N.R. and P.L. informed various school officials and police officers that they each had had sexual intercourse with the defendant. Additional facts and procedural history will be set forth as necessary.

I

## WHETHER THE DEFENDANT'S CONVICTIONS VIOLATE THE RIGHT OF PRIVACY GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS

The defendant first claims that § 53a-71 (a) (8) is invalid on its face and as applied to the facts of the present case because it violates his fundamental right of privacy guaranteed by both the federal and state constitutions, which he claims includes the right to engage in noncommercial consensual sexual intercourse with individuals over the age of consent.[9] The state responds that neither the federal nor the state constitution guarantees a right of sexual privacy but, in any event, even if such a right exists, it does not protect sexual acts between individuals who are situated in an inherently coercive relationship, such as the teacher-student relationship. We need not decide whether a fundamental right of sexual privacy exists generally because we agree with the state that, even if

---

[9] We note that the defendant did not preserve this claim in the trial court and, therefore, seeks to prevail either under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5. In *State* v. *Golding*, supra, 239–40, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." The record is adequate for our review, and the defendant has raised a claim of constitutional magnitude alleging the violation of a fundamental right. See, e.g., *Paul* v. *Davis*, 424 U.S. 693, 713, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976) (right to privacy under federal constitution includes "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education"); *Ramos* v. *Vernon*, 254 Conn. 799, 836, 761 A.2d 705 (2000) ("state constitution *may*, in certain instances, afford greater substantive due process rights than the federal constitution" [emphasis in original]). Accordingly, the defendant may seek to prevail under *Golding*.

such a right exists, it does not protect sexual intimacy in the context of an inherently coercive relationship, such as the teacher-student relationship, wherein consent might not easily be refused.

As a preliminary matter, we note that the defendant's claim encompasses both a facial challenge and an as applied challenge to the constitutionality of § 53a-71 (a) (8). A facial challenge essentially is "a claim that the law is invalid in toto—and therefore incapable of any valid application." (Internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 522 n.21, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). By contrast, an as applied challenge is a claim that the law is invalid as applied to the defendant under the facts of that particular case. Id. Thus, "in order to challenge successfully the facial validity of a statute, [the challenging] party [must] demonstrate as a threshold matter that the statute may not be applied constitutionally to the facts of his case."[10] *Packer* v.

---

[10] The one exception to this general rule is the doctrine of substantial overbreadth. See 16 Am. Jur. 2d, Constitutional Law § 140 (1998); see also *Ramos* v. *Vernon*, 254 Conn. 799, 811–12, 761 A.2d 705 (2000) (overbreadth doctrine applicable to claims brought under state constitution). "A clear and precise enactment may . . . be overbroad if in its reach it prohibits constitutionally protected conduct. . . . A single impermissible application of a statute, however, will not be sufficient to invalidate the statute on its face; rather, to be invalid, a statute must reach a *substantial* amount of constitutionally protected conduct. . . . A [defendant] may challenge a statute as facially overbroad . . . even if the [defendant's] conduct falls within the permissible scope of the statute, to vindicate two substantial interests: (1) eliminating the statute's chilling effect on others who fear to engage in the expression that the statute unconstitutionally prohibits; and (2) acknowledging that every [person] has the right not to be prosecuted for expression under a constitutionally overbroad statute. . . . Thus, the [defendant] has standing to raise a facial overbreadth challenge to the [statute] and may prevail on that claim if he can establish that the [statute] reaches a *substantial* amount of constitutionally protected conduct even though he personally did not engage in such conduct." (Emphasis added; internal quotation marks omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 167, 827 A.2d 671 (2003).

The defendant claims that § 53a-71 (a) (8) is unconstitutionally overbroad because it prohibits private consensual sexual intercourse between a school employee and a student regardless of the age of the student and regardless

*Board of Education*, 246 Conn. 89, 106, 717 A.2d 117 (1998). Because the defendant's facial challenge necessarily must fail if we conclude that § 53a-71 (a) (8) may be applied constitutionally to the facts of the present case; see footnote 10 of this opinion; we limit our analysis to the defendant's as applied challenge to the statute.

The constitutionality of a statute presents a question of law over which our review is plenary. *State* v. *Long*, supra, 268 Conn. 520. It is well established that "a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Citations omitted; internal quotation marks omitted.) Id., 521.

Before addressing the merits of the defendant's claim, we review the following relevant statutory provisions. Under our statutory scheme, a minor generally has the legal capacity to consent to sexual intercourse once he or she attains the age of sixteen. See General Statutes § 53a-71 (a) (1) (prohibiting sexual intercourse with individual under sixteen years of age, unless actor is less than two years older than individual); see also General Statutes § 1-1d ("the terms 'minor', 'infant' and 'infancy' shall be deemed to refer to a person under the age of eighteen"). Accordingly, the legislature has

of whether the school employee had been aware of, or had been reckless with respect to, the enrollment status of the student. In light of our conclusions in parts I A and B of this opinion that a teacher does not have a fundamental right of sexual privacy vis-à-vis students enrolled in the school system in which the teacher is employed, the defendant has failed to establish that § 53a-71 (a) (8) proscribes a substantial amount of protected conduct.

determined that, under most circumstances, an individual who is sixteen years of age or older is "an adult capable of making an intelligent choice in matters relating to sex." *State* v. *Perruccio*, 192 Conn. 154, 164, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984).

With this background in mind, we turn to § 53a-71 (a), which provides that "[a] person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and . . . (8) the actor is a school employee and such other person is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor . . . ." General Statutes § 53a-65 (13) defines the term " '[s]chool employee' " as "a teacher, substitute teacher, school administrator, school superintendent, guidance counselor, psychologist, social worker, nurse, physician, school paraprofessional or coach employed by a local or regional board of education or a private elementary or secondary school or working in a public or private elementary or secondary school." Accordingly, § 53a-71 (a) (8) prohibits a secondary schoolteacher from having sexual intercourse with a student enrolled in the school in which that teacher is employed, regardless of the age of the student and regardless of the allegedly consensual nature of the sexual relationship.[11]

---

[11] We note that § 53a-71 (a) also prohibits sexual intercourse in the context of other relationships regardless of the age of the victim and regardless of the allegedly consensual nature of the sexual conduct. For example, the statute prohibits, inter alia, a correctional officer from having sexual intercourse with an inmate; General Statutes § 53a-71 (a) (5); a psychotherapist from having sexual intercourse with a current or former patient if certain conditions exist; General Statutes § 53a-71 (a) (6); and an athletic coach from having sexual intercourse with a secondary school student receiving athletic instruction in a secondary school setting. General Statutes § 53a-71 (a) (9); see also General Statutes § 53a-71 (a) (10) (person is guilty of sexual assault in second degree "when such person engages in sexual intercourse with another person and . . . the actor is twenty years of age or older and stands in a position of power, authority or supervision over

A

Right of Sexual Privacy under the Federal Constitution

The defendant first claims that his convictions under § 53a-71 (a) (8) violate his fundamental right of sexual privacy guaranteed by the constitution of the United States. Specifically, the defendant claims that, in *Lawrence* v. *Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), the United States Supreme Court explicitly recognized that the right of privacy includes the right to engage in private noncommercial consensual sexual intercourse with individuals over the age of consent. Because the defendant was convicted under § 53a-71 (a) (8) for having consensual sexual intercourse with two of his students, N.R and P.L., both of whom were over the age of consent when the sexual intercourse took place, the defendant claims that his convictions are unconstitutional. We conclude that the right of privacy guaranteed by the federal constitution does not encompass the right of a teacher to have sexual intercourse with students enrolled in the school system in which the teacher is employed. We further conclude that § 53a-71 (a) (8) rationally is related to a legitimate government interest and, therefore, that the defendant's convictions are constitutional.

"While there is no right of privacy found in any specific guarantee of the [c]onstitution, the [United States Supreme] Court has recognized that zones of privacy may be created by more specific constitutional guarantees and thereby impose limits upon government power. . . . [T]he [court] has recognized a right to privacy in the penumbra of the Bill of Rights, specifically in the protections of the first, third, fourth and fifth amendments. . . . Justice Brandeis has referred to this right

such other person by virtue of the actor's professional, legal, occupational or volunteer status and such other person's participation in a program or activity, and such other person is under eighteen years of age").

as the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. . . .

"[Aside from the unreasonable search and seizure privacy cases, the] other right of privacy cases, while defying categorical description, deal generally with substantive aspects of the [f]ourteenth [a]mendment. . . . The activities detailed as being within this definition . . . [include] matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the [s]tates' power to substantively regulate conduct. . . . [T]he Supreme Court has extended their protection only to the most basic personal decisions. . . . Nor has the Supreme Court been quick to expand these rights to new fields." (Citations omitted; internal quotation marks omitted.) *In re Michaela Lee R.*, 253 Conn. 570, 598–99, 756 A.2d 214 (2000).

In *Bowers* v. *Hardwick*, 478 U.S. 186, 190, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), the United States Supreme Court considered the constitutionality of a Georgia statute that criminalized private noncommercial consensual sexual intercourse between adults of the same sex. The court first considered whether the "[f]ederal [c]onstitution confers a fundamental right upon homosexuals to engage in sodomy . . . ." Id. The court observed that the constitution provides heightened protection only to "those fundamental liberties that are 'implicit in the concept of ordered liberty' "; id., 191; or that are " 'deeply rooted in this [n]ation's history and tradition.' " Id., 192. Because the proscription against homosexual sodomy has "ancient roots"; id.; the court concluded that it would be, "at best, facetious," to claim that a right to engage in such conduct is " 'deeply rooted in this [n]ation's history and tradition' or 'implicit in the concept of ordered liberty' . . . ." Id., 195. Having concluded that the Georgia statute did not implicate

a fundamental right, the court addressed whether the statute was rationally related to a legitimate government interest. Id., 196. The sole rational basis for the statute, the court observed, was "the presumed belief of the majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable." Id. The court concluded that Georgia's interest in preserving morality was legitimate, and that the prohibition on homosexual sodomy rationally was related to this interest. The court noted that, "[t]he law . . . is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the [d]ue [p]rocess [c]lause, the courts will be very busy indeed." Id.

Seventeen years later, in *Lawrence* v. *Texas*, supra, 539 U.S. 562, the United States Supreme Court again considered the constitutionality of a statute that criminalized private noncommercial consensual sexual intercourse between adults of the same sex. The court recognized that, in *Bowers*, it explicitly had upheld the constitutionality of such statutes. The court concluded, nonetheless, that in *Bowers* the court had "misapprehended the claim of liberty there presented to it"; id., 567; by asking whether the statute violated a fundamental right to engage in a particular sexual act. Instead, the court determined, the issue properly should be characterized as whether freely consenting adults have a liberty interest in intimate personal relationships fostered in the privacy of their own home. Id.

With the question thus properly framed, the court reconsidered the validity of its holding in *Bowers*. The court observed that, in upholding the constitutionality of the Georgia statute at issue in that case, it had relied principally on the fact that "for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable

behavior, and respect for the traditional family." Id., 571. Although "[f]or many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles"; id.; the court concluded that these principles are not dispositive. This is because the issue presented in *Bowers*, like the issue presented in *Lawrence*, was not whether the proscribed sexual act historically has been viewed as immoral, but, rather, "whether the majority may use the power of the [s]tate to enforce these views on the whole society through operation of the criminal law." Id. In answering this question, the court observed that its "prior cases make two propositions abundantly clear. First, the fact that the governing majority in a [s]tate has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of liberty protected by the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons." (Internal quotation marks omitted.) Id., 577–78. In light of these two principles, the court concluded that "*Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. [*Bowers*] should be and now is overruled." Id., 578.

Having concluded that it was not constrained by the precedent established in *Bowers*, the court next addressed whether the statute at issue in *Lawrence* was constitutional. The court observed that, "[t]he present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be

refused. It does not involve public conduct or prostitution. . . . The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle." Id. In light of these facts, the court concluded that "[t]he petitioners are entitled to respect for their private lives. The [s]tate cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the [d]ue [p]rocess [c]lause gives them the full right to engage in their conduct without intervention of the government." Id. Because the "statute further[ed] no legitimate state interest which [could] justify its intrusion into the personal and private life of the individual"; id.; the court concluded that it was unconstitutional.

The defendant claims that *Lawrence* stands for the proposition that sexual privacy is a fundamental right entitled to strict scrutiny under the due process clause of the federal constitution. We need not determine whether *Lawrence* established a fundamental right of sexual privacy under the federal constitution because, even assuming arguendo that it did so, the defendant's sexual conduct in the present case would not be protected by that right. The defendant engaged in sexual intercourse with two victims, N.R. and P.L., both of whom were students enrolled in the school system in which the defendant was employed as a teacher. In light of the disparity of power inherent in the teacher-student relationship, we conclude that both victims were situated in an inherently coercive relationship with the defendant wherein consent might not easily be refused. Cf. *Loomis* v. *United States*, 68 Fed. Cl. 503, 519 (2005) ("the nature of the relationship [between lieutenant colonel and private first class] while not directly within a chain of command, is such that consent might not easily be refused and thus it is outside of the liberty interest protected by *Lawrence*"), appeal

dismissed, 2006 U.S. App. LEXIS 23206 (August 31, 2006); *Talbert* v. *State*, 367 Ark. 262, 269, 239 S.W.3d 504 (2006) (defendant did not have fundamental right under *Lawrence* to use position of trust and authority as clergyman to engage in sexual conduct); *Commonwealth* v. *Mayfield*, 574 Pa. 460, 472, 832 A.2d 418 (2003) ("[s]exual contact between correctional staff and inmates is obviously rife with the possibility of coercion, both subtle and overt, given the extensive power guards exercise over inmates" and, accordingly, *Lawrence* is inapplicable). Accordingly, the right of sexual privacy purportedly delineated in *Lawrence* would not apply to the circumstances of the present case.

We next address whether § 53a-71 (a) (8) rationally is related to a legitimate government interest. See *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 888, 792 A.2d 774 (2002) (if statute "does not implicate a fundamental right, we review [it] under a rational basis test" and "[i]n such circumstances, the state must show only that the law is not arbitrary or capricious, that is, that it bears a reasonable relation to some legitimate state purpose"). The state contends that the government has a legitimate interest in promoting a safe school environment. The state further contends that § 53a-71 (a) (8) rationally is related to this interest because it prohibits a teacher from using his or her position of authority to pursue sexual relationships with students enrolled in the school system in which the teacher is employed. We agree. It is beyond cavil that the government has a legitimate interest in providing a safe and healthy educational environment for elementary and secondary school students. See, e.g., *Wolman* v. *Walter*, 433 U.S. 229, 236, 97 S. Ct. 2593, 53 L. Ed. 2d 714 (1977) ("we have no difficulty with . . . [concluding that a state has a] legitimate interest in protecting the health of its youth and in providing a fertile educational environment for all the schoolchildren of the

[s]tate"), overruled in part on other grounds by *Mitchell* v. *Helms*, 530 U.S. 793, 835, 120 S. Ct. 2530, 147 L. Ed. 2d 660 (2000); *Horton* v. *Meskill*, 172 Conn. 615, 647, 376 A.2d 359 (1977) ("Connecticut has for centuries recognized it as her right and duty to provide for the proper education of the young" [internal quotation marks omitted]). To this end, the legislature reasonably could have concluded that school employees "are given unique access to students, and are thereby vested with great trust and confidence by the school, parents, and public, and [the legislature could have] sought to preserve or strengthen that trust by unequivocally prohibiting school employees from misusing their access to students as a conduit for sex." *Ex parte Morales*, 03-05-00489-CR (Tex. App. July 21, 2006) (Texas statute that prohibited teachers from having sexual intercourse with students rationally was related to legitimate government interest). Moreover, the legislature reasonably could have concluded that a sexually charged learning environment likely would confuse, disturb and distract students, thereby undermining the quality of education in the state. Id. Accordingly, we conclude that the proscription on sexual intercourse between school employees and students in § 53a-71 (a) (8) rationally is related to a legitimate government interest.

B

Right of Sexual Privacy under the State Constitution

The defendant next claims that the state constitution provides greater protection for the right of privacy than does the federal constitution, and that this protection includes the right of a teacher to engage in consensual sexual intercourse with students over the age of consent enrolled in the school system in which the teacher is employed.[12] We disagree.

---

[12] The defendant claims that this court first must consider whether a fundamental right of sexual privacy exists generally, irrespective of the relationship between the participants to the prohibited sexual act. In support of this claim, the defendant relies on *Lawrence* v. *Texas*, supra, 539 U.S.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [222 Conn. 672, 684–86, 610 A.2d 1225 (1992)],

566–67, wherein the United States Supreme Court observed that, in *Bowers* v. *Hardwick*, supra, 478 U.S. 190, it had characterized the purported right of sexual privacy too narrowly and, therefore, had "misapprehended the claim of liberty there presented to it . . . ." *Lawrence* v. *Texas*, supra, 567. We conclude that the defendant's reliance on *Lawrence* is misplaced because, contrary to the defendant's claim, the court in *Lawrence* did not ignore the relationship between the participants to the prohibited sexual act. The court merely cautioned that, when reviewing a statute criminalizing private noncommercial consensual sexual conduct, it is improper to focus on the right to engage in specific sexual *acts*, as the court had done in *Bowers*. Instead, the court should focus on the right to foster certain intimate *relationships*. Accordingly, pursuant to *Lawrence*, the critical inquiry is whether the prohibited intimate relationship is within the liberty interest of the participants to choose, not on whether a right to engage in sexual conduct exists generally. Id. ("The laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. . . . The statutes do [however] seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals."); see also *State* v. *Jason B.*, 248 Conn. 543, 561–62, 729 A.2d 760 ("consensual sexual intercourse, by definition, requires at least two actors," and, accordingly, alleged fundamental right to engage in consensual sexual intercourse must be evaluated in light of relationship between sexual participants), cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999).

we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Citations omitted; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 560–61, 881 A.2d 290 (2005), cert. denied, 547 U.S 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

The first *Geisler* factor, federal precedent, favors the state. As explained in part I A of this opinion, even if we were to assume arguendo that a fundamental right of sexual privacy exists under the federal constitution, that right would not extend to sexual acts performed on or by "persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused." *Lawrence* v. *Texas*, supra, 539 U.S. 578. In light of our determination in part I A of this opinion that the teacher-student relationship is an inherently coercive relationship wherein consent might not easily be refused, the defendant's sexual conduct in the present case is not entitled to federal constitutional protection.[13]

---

[13] In support of his claim, the defendant also relies on *Roberts* v. *United States Jaycees*, 468 U.S. 609, 617–18, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984), in which the United States Supreme Court recognized the right of freedom of association as a component of personal liberty guaranteed by the fourteenth amendment of the federal constitution. The right of freedom of association affords "certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the [s]tate." Id., 618. Because the defendant has failed to establish that the right of freedom of association includes within its ambit a teacher's right to have consensual sexual intercourse with a student enrolled in the school system in which the teacher is employed, we conclude that the defendant's reliance on *Roberts* is misplaced. See id., 621–23 (right of freedom of association did not protect United States Jaycees' exclusion of women from membership); see also *Patel* v. *Searles*, 305 F.3d 130, 136 (2d Cir. 2002) (right of freedom of association

The second *Geisler* factor, the textual approach, also favors the state. The right of privacy, which cannot be found in any specific guarantee either of the federal or state constitution, is protected by the due process clause of the fourteenth amendment to the federal constitution; *Paul* v. *Davis*, 424 U.S. 693, 712–13, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976); and the due process clause of article first, § 8, of the constitution of Connecticut. The text of these two constitutional provisions is virtually identical. Compare U.S. Const., amend. XIV, § 1 ("[n]o [s]tate shall . . . deprive any person of life, liberty or property, without due process of law"), with Conn. Const., art. I, § 8 ("[n]o person shall be . . . deprived of life, liberty or property without due process of law"). The textual similarity between the federal and state due process clauses undermines the defendant's claim that the state constitution affords greater protection of the right of sexual privacy than the federal constitution and, instead, "support[s] a common source[14] and, thus, a common interpretation of the provisions." *State* v. *Ledbetter*, supra, 275 Conn. 562.

The third *Geisler* factor, the historical approach, is neutral. Neither the defendant nor the state has identified any relevant evidence of the intent of our constitutional forebears with respect to the right of privacy. Id., 563.

The fourth *Geisler* factor, Connecticut precedent, favors the state. "In determining the scope of our state constitution's due process clauses, we have taken as a point of departure those constitutional or quasi-consti-

---

protected plaintiff's familial relationship with wife, children, father and siblings from undue governmental interference), cert. denied, 538 U.S. 907, 123 S. Ct. 1486, 155 L. Ed. 2d 227 (2003).

[14] "The declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 562–63 n.18.

tutional rights that were recognized at common law in this state prior to 1818." (Internal quotation marks omitted.) *Ramos* v. *Vernon*, 254 Conn. 799, 838, 761 A.2d 705 (2000). The defendant has not provided any historical evidence that a right of sexual privacy between a teacher and a student was recognized in this state prior to 1818. Additionally, the defendant has not pointed to any case law in which this court has construed the right of privacy protected by the due process clause of the state constitution to be broader than its federal counterpart. Cf. id., 837–38 (although state constitution may provide greater substantive due process protection than federal constitution, plaintiff failed to establish that "our state constitution contains greater rights of 'family autonomy' than does the federal constitution"). In support of his constitutional claim, the defendant relies on cases such as *State* v. *Donahue*, 251 Conn. 636, 645, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), and *State* v. *Oquendo*, 223 Conn. 635, 646–53, 613 A.2d 1300 (1992), in which this court concluded that article first, §§ 7 and 9, of the state constitution provide greater protection against unreasonable searches and seizures than the fourth amendment of the federal constitution.[15]

[15] The defendant also relies on *State* v. *Ferrell*, 191 Conn. 37, 45, 463 A.2d 573 (1983), wherein this court concluded that "[s]tatements obtained in violation of the privacy required to effectuate the *Miranda* rights may not be admitted into evidence against the defendant in the state's case in chief without violating the defendant's due process right to a fair trial." Our conclusion in *Ferrell* was based not only "on our interpretation of the fourteenth amendment to the United States constitution, but also . . . on the alternate, independent state ground of the due process clause of the Connecticut constitution. Conn. Const., art. I, § 8; see *Michigan* v. *Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)." *State* v. *Ferrell*, supra, 45 n.12. The defendant claims that *Ferrell* establishes that article first, § 8, of the state constitution "give[s] greater privacy protection to Connecticut citizens in criminal matters." We disagree. In *Ferrell*, we concluded that the *procedural* due process afforded to the defendant in that case violated the minimal requirements of article first, § 8, because "the right to consult a lawyer before being interrogated is meaningless if the accused cannot privately and freely discuss the case with that attorney."

Although these cases support the proposition that the state constitutional right to be free from unreasonable searches and seizures is broader than its federal counterpart, they do not support the proposition that the state constitutional right of privacy protected by article first, § 8, provides greater protection than the federal constitutional right of privacy guaranteed by the fourteenth amendment.

The fifth *Geisler* factor, sister state precedent, favors the state. As the defendant points out, various state courts have concluded that the right of sexual privacy is a fundamental right protected by their respective state constitutions. See, e.g., *B. B.* v. *State*, 659 So. 2d 256, 258 (Fla. 1995) (statute that criminalized minor's "carnal intercourse with [another] unmarried minor of previous chaste character" violated right of privacy protected by Florida constitution); *Powell* v. *State*, 270 Ga. 327, 336, 510 S.E.2d 18 (1998) (statute that criminalized private noncommercial consensual sodomy violated right of privacy protected by Georgia constitution); *Gryczan* v. *State*, 283 Mont. 433, 447–56, 942 P.2d 112 (1997) (statute that criminalized consensual sexual acts between adults of same sex violated right of privacy protected by Montana constitution); *Campbell* v. *Sundquist*, 926 S.W.2d 250, 258–66 (Tenn. App. 1996) (statute that criminalized consensual homosexual acts violated right of privacy protected by Tennessee constitution). These courts, however, have construed their state constitutions to protect the right of freely consenting adults to engage in noncommercial sexual acts in the privacy of their own homes.[16] Notably, no state has concluded

Id., 45. Because the defendant in the present case raises a *substantive* due process claim, rather than a *procedural* due process claim, we conclude that *Ferrell* is inapposite.

[16] There is one exception. In *B. B.* v. *State*, supra, 659 So. 2d 256, the Florida Supreme Court concluded that the Florida constitution protects the right of freely consenting *minors* to engage in private noncommercial sexual conduct. In that case, the court observed that, in a "minor-minor situation, the crux of the [s]tate's interest is in protecting the minor from the sexual

that a state constitutional right of sexual privacy exists when a significant disparity of power is inherent in the prohibited sexual relationship, such as the disparity of power endemic to the teacher-student relationship. See part I A of this opinion. Indeed, as the defendant concedes, numerous states have enacted penal statutes prohibiting elementary or secondary schoolteachers from having sexual intercourse with their students, regardless of the allegedly consensual nature of the sexual relationship. See, e.g., Ark. Code Ann. § 5-14-125 (a) (6) (Michie 2006); Iowa Code Ann. § 709.15 (3) (West Sup. 2006); Kan. Stat. Ann. § 21-3520 (a) (8) (Sup. 2005); Me. Rev. Stat. Ann. tit. 17-A, § 253 (2) (F) (West 2006); Mich. Comp. Laws Serv. § 750.520d (1) (e) (LexisNexis 2003); Miss. Code Ann. § 97-29-3 (LexisNexis 2006); Nev. Rev. Stat. § 201.540 (2005); N.M. Stat. Ann. § 30-9-13 (D) (2) (Michie 2004); N.C. Gen. Stat. Ann. § 14-27.7 (b) (LexisNexis 2005); Okla. Stat. Ann. tit. 21, § 1111 (A) (8) (West 2002); Tex. Penal Code Ann. § 21.12 (Vernon Sup. 2006); Wash. Rev. Code Ann. § 9A.44.093 (1) (b) (West Sup. 2005); Wis. Stat. Ann. § 948.095 (West 2005). Accordingly, we conclude that this *Geisler* factor tips in favor of the state.

Finally, the sixth *Geisler* factor, economic and sociological considerations, favors the state. Elementary and secondary schoolteachers are entrusted with the important task of cultivating and educating impressionable young minds. Thus, not only are teachers afforded unique access to students, they also are vested with

---

activity itself for reasons of health and quality of life." Id., 259. By contrast, in an "adult-minor situation," the state has a compelling interest in "the prevention of exploitation of the minor by the adult." Id. ("[s]exual exploitation of children is a particularly pernicious evil that sometimes may be concealed behind the zone of privacy" [internal quotation marks omitted]). Because the Florida statute at issue in *B. B.* was not "being utilized as a shield to protect a minor, but rather, [was] being used as a weapon to adjudicate a minor delinquent"; id., 260; the court concluded that the statute was unconstitutional as applied to the minor defendant in that case. Id.

significant authority and control over those students. As such, a teacher easily could use his or her position of trust and authority to coerce a student into a sexual relationship. Indeed, in light of the significant disparity of power inherent in the teacher-student relationship, a student reasonably may not be able to refuse a teacher's sexual advances. Because the state has a strong interest in protecting and educating the elementary and secondary school students of this state, and because the defendant has failed to highlight any societal interest furthered by a recognition of a state constitutional right of sexual privacy between a teacher and a student, we conclude that this *Geisler* factor weighs heavily in favor of the state. See *State* v. *Diaz*, 226 Conn. 514, 540, 628 A.2d 567 (1993) ("[i]n effect, [the sixth *Geisler*] factor directs our attention to considerations of public policy").

None of the *Geisler* factors weighs in favor of the defendant's claim that the state constitution confers a fundamental right of sexual privacy on an elementary or secondary schoolteacher to engage in consensual sexual intercourse with students over the age of consent enrolled in the school system in which the teacher is employed. Accordingly, the defendant's state constitutional claim must fail.

II

WHETHER THE TRIAL COURT IMPROPERLY CONSOLIDATED THE CASES OF N.R. AND P.L. AND IMPROPERLY ADMITTED EVIDENCE OF UNCHARGED MISCONDUCT

The defendant next claims that the trial court improperly consolidated the cases of N.R. and P.L. because it improperly concluded that, if the cases had been tried separately, evidence of the defendant's uncharged sexual misconduct with each victim would have been

admissible in the case of the other to establish a common scheme or plan.[17] Alternatively, the defendant claims that the trial court improperly consolidated the cases of N.R. and P.L. under *State* v. *Boscarino*, 204 Conn. 714, 719–23, 529 A.2d 1260 (1987), because the crimes charged did not involve discrete, easily distinguishable factual scenarios and were of a brutal and shocking nature. Lastly, the defendant claims that the trial court improperly admitted evidence of the defendant's uncharged sexual misconduct with a third victim, R.S., to establish a common scheme or plan in the cases of N.R. and P.L. because the nature of the defendant's relationship with R.S. was distinct from the nature of the defendant's relationships with both N.R. and P.L.

The state responds that the trial court properly consolidated the cases of N.R. and P.L. because, if the cases had been tried separately, the evidence of the defendant's uncharged sexual misconduct with each victim would have been admissible to establish a common scheme or plan in the case of the other. Alternatively, the state maintains that the trial court properly exercised its discretion to consolidate the two cases under *Boscarino*. Lastly, the state claims that the trial court properly admitted evidence of the defendant's uncharged sexual misconduct with R.S. to establish a common scheme or plan.

We conclude that the trial court properly determined that, if the cases of N.R. and P.L. had been tried separately, evidence of the defendant's uncharged sexual misconduct with each victim would have been admissi-

---

[17] Additionally, the defendant invites this court to adopt a more restrictive standard for the admission of evidence of uncharged misconduct to establish a common scheme or plan in sexual assault cases. In light of our recent decision in *State* v. *Sawyer*, 279 Conn. 331, 332 n.1, 904 A.2d 101 (2006), wherein we refused to disturb "our holdings in sexual assault cases that prior sexual misconduct is viewed more liberally than other types of prior misconduct," we decline the defendant's invitation.

ble to establish a common scheme or plan in the case of the other. Because separate trials would have provided the defendant with no significant benefit, we conclude that the trial court properly consolidated the cases of N.R. and P.L. We further conclude that the trial court did not abuse its discretion in admitting evidence of the defendant's uncharged sexual misconduct with R.S. to establish a common scheme or plan in the cases of N.R. and P.L.

The following additional facts and procedural history are necessary to our resolution of the defendant's claims. The defendant originally was charged in five informations. Four of the informations concerned N.R. and P.L. and alleged a total of nine counts of sexual assault in the second degree in violation of § 53a-71 (a) (8). The fifth information involved a third victim, R.S., and alleged one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (6).[18] On August 13, 2003, the state filed a motion to consolidate the five cases against the defendant for trial, to which the defendant objected. On November 17, 2003, the trial court, *Devlin, J.*, held a hearing on the issue of joinder. At the hearing, the state claimed that consolidation was appropriate under the factors set forth in *Boscarino*, because the charges involved discrete, easily distinguishable factual scenarios, the crimes charged were not brutal or shocking in nature,

[18] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . (6) such person is a school employee and subjects another person to sexual contact who is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor . . . ." General Statutes § 53a-65 (3) defines the term " '[s]exual contact' " as "any contact with the intimate parts of a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person."

and the trial would not be lengthy or complex. Additionally, the state claimed that consolidation of the five cases would not prejudice the defendant because evidence of the defendant's uncharged sexual misconduct with each victim would be admissible to establish a common scheme or plan in the cases of the other victims. The defendant agreed that the charges involving N.R. should be consolidated and tried jointly, and that the charges involving P.L. should be consolidated and tried jointly. The defendant maintained, however, that the cases of N.R., P.L. and R.S. should be tried separately to avoid undue prejudice to the defendant. Specifically, with respect to the cases of N.R. and P.L., the defendant claimed that the factual similarity between the charges, namely, sexual intercourse in East Rock Park or the Fairfield University Library with a female student enrolled in Career School, would make it difficult for the jury "to keep [the charges] straight . . . ." Additionally, the defendant claimed that the sexual assault charges were brutal and shocking in nature. The defendant further maintained that evidence of his uncharged sexual misconduct with each victim would not be admissible to establish a common scheme or plan in the cases of N.R., P.L. or R.S. because the alleged misconduct was not distinctive and, therefore, could not be characterized as a "signature crime." Lastly, the defendant claimed that it would be prejudicial to consolidate the case of R.S., which involved one charge of sexual assault in the fourth degree, with the cases of N.R. and P.L., which both involved multiple charges of sexual assault in the second degree, because the defendant's alleged sexual misconduct with R.S. was significantly less severe and less frequent than was his alleged sexual misconduct with N.R. and P.L.

With respect to the cases of N.R. and P.L., the trial court concluded that evidence of the defendant's uncharged sexual misconduct with each victim would

be admissible to establish a common scheme or plan in the case of the other. The court noted that the alleged sexual misconduct had occurred during the same relevant time period and shared key factual similarities, such as the enrollment status and age of the victim. As such, the trial court concluded that the defendant's alleged misconduct "demonstrates a plan on the part of the defendant to, basically, exploit his position as a teacher to . . . [seduce], and then, sexually assault the students," and that the probative value of the evidence outweighed its prejudicial effect. Accordingly, the trial court granted the state's motion to consolidate the cases of N.R. and P.L.[19] The court denied the state's motion to consolidate the case of R.S., however, "because of the difference in the degree of sexual conduct alleged." The trial court nonetheless concluded that evidence of the defendant's uncharged sexual misconduct with R.S. would be admissible to establish a common scheme or plan in the consolidated case of N.R. and P.L.

A

Consolidation of Cases concerning N.R. and P.L.

We first address the defendant's claim that the trial court improperly consolidated the cases of N.R. and P.L. for trial. General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." See also Practice Book § 41-19 ("[t]he judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be

---

[19] On November 18, 2003, the state filed an amended information in Docket No. CR02-0004040-T charging the defendant with five additional counts of sexual assault of P.L. in violation of § 53a-71 (a) (8). See footnote 3 of this opinion.

tried together"). "In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions." (Citations omitted; internal quotation marks omitted.) *State* v. *Herring*, 210 Conn. 78, 94–95, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

"Where evidence of one incident can be admitted at the trial of the other, separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987) (trial court properly consolidated cases because evidence of defendant's uncharged misconduct would have been admissible to prove identity in separate trials); see also *State* v. *Greene*, 209 Conn. 458, 464, 551 A.2d 1231 (1988) ("[t]he trial court properly joined the two cases for trial because, in the event of separate trials, evidence relating to each of the cases would have been admissible in the other"); *State* v. *Marsala*, 43 Conn. App. 527, 533, 684 A.2d 1199 (1996) ("joinder of the twenty-five claims was proper because evidence relating to each count could have been used in a trial of each of the other counts to prove the identity of the defendant, the intent of the defendant, and to demonstrate a common scheme"), cert. denied, 239 Conn. 957, 688 A.2d 329 (1997).

"Substantial prejudice does not necessarily result from a denial of severance even where evidence of one offense would not have been admissible at a separate trial involving the second offense." *State* v. *Pollitt*, supra, 205 Conn. 68. Consolidation under such circum-

stances, however, may expose the defendant "to potential prejudice for three reasons: First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 374–75, 852 A.2d 676 (2004).

Despite the existence of these risks, this court consistently has recognized "a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion . . . will not second guess the considered judgment of the trial court as to the joinder or severance of two or more charges." (Citation omitted; internal quotation marks omitted.) Id., 375.

Accordingly, we first address whether the trial court properly concluded that, if the cases of N.R. and P.L. had been tried separately, evidence of the defendant's uncharged sexual misconduct with one victim would have been admissible to establish a common scheme or plan in the case of the other. "As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . On the

other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . .

"When evidence of other offenses is offered to show a common plan or design the marks which the uncharged and the charged offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other. . . . To guide this analysis, we have held that [e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan where the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness. . . . We are more liberal in admitting evidence of other criminal acts to show a common scheme or pattern in sex related crimes than other crimes." (Citations omitted; internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 820–21, 865 A.2d 1135 (2005).

The defendant concedes that both the first and third factors are satisfied in the present case because the defendant's sexual misconduct with N.R. and P.L. occurred during the same relevant time period and both victims were similar in age and circumstance. The defendant contends, however, that the second factor is

not satisfied because the charged and uncharged offenses are not similar in character. He points out that his sexual misconduct with P.L. "was more extreme and far more frequent than [his sexual] activity involving [N.R.]." (Internal quotation marks omitted.) In support of this claim, the defendant relies on *State* v. *Ellis*, supra, 270 Conn. 352–68, wherein we concluded that the trial court improperly had denied the defendant's motion in limine to exclude evidence of uncharged sexual misconduct involving three victims, Julia S., Kristin C. and Kaitlyn M., in the case of a fourth victim, Sarah S., because "Sarah S.'s relationship with the defendant differed in several important respects from his relationship with the other girls" and because "there were few similarities between [the defendant's] abuse of Sarah S. and his abuse of the other girls." Id., 358. We conclude that the defendant's reliance on *Ellis* is misplaced.

In *Ellis*, the defendant, a softball coach, was charged, inter alia, with ten counts of sexual misconduct with Sarah S., the younger sister of a softball player whom the defendant had coached. Id., 339–40, 346. The trial court denied the defendant's motion in limine to exclude evidence of uncharged sexual misconduct involving Julia S., Kristin C. and Kaitlyn M., all of whom were players on the defendant's softball team. Id., 354, 361. We concluded that the trial court improperly had denied the motion because, "the defendant's relationship with Sarah S. differed in several key respects from his relationships with the other girls." Id., 360. Specifically, "Sarah S., unlike the other girls, was not a member of [the defendant's] softball team, did not have frequent and continuous contact with the defendant as a player, did not take weekly private lessons with the defendant over a period of several years, did not develop a close personal relationship with the defendant and did not regard him as a confidant. Even more significantly, she did not feel compelled, as did the other girls, to cultivate

or continue a relationship with the defendant following the abuse because of his ability to assist her in obtaining a college softball scholarship." Id., 361.

Moreover, the defendant's sexual misconduct with Sarah S. was far more frequent and severe than was his sexual misconduct with the other three victims. The defendant's sexual abuse of Sarah S. consisted of "a wide range of misconduct, including: (1) 'talking dirty' on the telephone and attempted phone sex; (2) multiple incidents of touching her breasts, thighs and in between her legs; (3) masturbating and ejaculating in her presence; (4) attempting to force her to perform oral sex; (5) attempting to force his tongue into her mouth; (6) digital penetration; (7) attempting to climb on top of her while she was lying in bed; and (8) repeated requests that she 'pleasure' him." Id., 359. By contrast, there only was one incident of sexual abuse involving Julia S., two involving Kristin C., and one involving Kaitlyn M. Id. "In the cases of Julia S. and Kristin C., the defendant grabbed and fondled the victims' breasts. In the case of Kaitlyn M., the defendant made sexual comments, touched her leg and kissed her. He also attempted to force his tongue into her mouth and told her that he loved her in ways that she could not understand." Id., 359–60. Although "the defendant's abuse of Julia S., Kristin C. and Kaitlyn M. bore some similarities, it had very little in common with his [frequent and severe] abuse of Sarah S." Id., 360.

The defendant concedes that, unlike the victims at issue in *Ellis*, both victims in the present case shared a similar relationship with the defendant. At the time of the misconduct, both N.R. and P.L. were sixteen year old female students enrolled in Career School who had developed a personal, confidential and sexual relationship with the defendant. The defendant claims, however, that, pursuant to *State* v. *Ellis*, supra, 270 Conn. 352–68, his sexual misconduct with N.R. and P.L. lacked

sufficient similarity to be admissible under the common scheme or plan exception because his sexual misconduct with P.L. was far more frequent and severe than his sexual misconduct with N.R. We disagree. The defendant's sexual relationships with both N.R. and P.L. began at Career School with intimate sexual embraces. The defendant first kissed N.R. in the late spring of her junior year while she and the defendant were in the library of Career School. Likewise, the defendant first kissed P.L. in the late spring of her junior year while she and the defendant were in an empty classroom in Career School. The defendant had sexual intercourse with N.R. in a car parked in East Rock Park, and in a car parked outside of Foote School, by penetrating her vagina digitally. Similarly, the defendant had sexual intercourse with P.L. in a car parked in East Rock Park, and in a car parked outside of P.L.'s home, by means of digital and penile vaginal penetration. The defendant performed oral sex on N.R. in a secluded corner on the second floor of the Fairfield University Library. Similarly, the defendant performed oral sex on P.L., and had penile-vaginal sexual intercourse with P.L., in a secluded corner on the second floor of the Fairfield University Library. On the basis of the foregoing, we conclude that the defendant's sexual misconduct with N.R. and P.L. was sufficiently similar to permit the jury to infer that, if he was guilty of the offenses involving one victim, then he also was guilty of the offenses involving the other. See *State* v. *Morowitz*, 200 Conn. 440, 443, 512 A.2d 175 (1986) ("[w]hen evidence of prior misconduct is offered to show a common plan or design, the marks which the [charged] and the [uncharged] offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other" [internal quotation marks omitted]).

We recognize that the defendant's sexual misconduct with P.L. was more frequent than his sexual misconduct

with N.R. Specifically, N.R. testified that she had had sexual intercourse with the defendant on three separate occasions, whereas P.L. testified that she had had sexual intercourse with the defendant on numerous occasions. In light of the striking qualitative similarity between the defendant's misconduct with the two victims, we conclude that this quantitative distinction, standing alone, is insufficient to support the defendant's claim that the offenses were not similar in character. See, e.g., *State* v. *James G.*, 268 Conn. 382, 394, 844 A.2d 810 (2004) (although uncharged misconduct was more frequent and severe than charged misconduct, trial court properly admitted evidence to establish defendant's common scheme or plan to abuse his daughters sexually); *State* v. *Hauck*, 172 Conn. 140, 146–47, 374 A.2d 150 (1976) (although uncharged misconduct was less frequent and severe than charged misconduct, trial court properly admitted evidence to establish defendant's common scheme or plan to extort sexual favors from female students in exchange for passing grades).

Moreover, given the marked similarity between the defendant's behavior with both N.R. and P.L., we further conclude that the trial court did not abuse its discretion in determining that the probative value of this evidence outweighed its prejudicial effect. See *State* v. *Merriam*, 264 Conn. 617, 664, 835 A.2d 895 (2003) ("[i]n light of the marked similarities between the charged and uncharged misconduct, the probative value of the latter was significant in regard to the issue of common plan or scheme"); *State* v. *George B.*, 258 Conn. 779, 793, 785 A.2d 573 (2001) (trial court did not abuse its discretion in concluding that probative value of uncharged sexual misconduct evidence outweighed its prejudicial effect, even though charged conduct involved greater degree of force).

For the foregoing reasons, we conclude that the trial court properly determined that, if the cases of N.R. and P.L. had been tried separately, evidence of the defendant's sexual misconduct with each victim would have been admissible to establish a common scheme or plan in the case of the other. Consequently, because the defendant was not substantially prejudiced by joinder of the cases for trial, we conclude that the trial court properly consolidated the cases of N.R. and P.L. for trial.

B

Evidence of Uncharged Sexual Misconduct with R.S.

We next address the defendant's claim that the trial court improperly admitted evidence of the defendant's uncharged sexual misconduct with R.S. to establish a common scheme or plan in the cases of N.R. and P.L. The following additional facts and procedural history are relevant to our resolution of this claim. At the defendant's trial, the state moved, outside the presence of the jury, to introduce evidence of the defendant's uncharged sexual misconduct with R.S. to establish a common scheme or plan. As an offer of proof, the state represented that R.S. was a student enrolled in Career School during the 2000–2001 academic year, and that, during this time period, the defendant had embraced R.S. in a sexual manner on multiple occasions and had made statements to R.S. that were sexual in nature. The defendant objected to the admission of this evidence, claiming that it did not establish a common scheme or plan and that its prejudicial effect exceeded its probative value. The trial court concluded that the evidence was "relevant to establish a common plan or scheme on the part of the defendant to have inappropriate sexual conduct [and] conversations with female students, high school-aged students" and that the probative value of the evidence outweighed its prejudicial effect.

Thereafter, R.S. testified that she was a student enrolled in her junior year at Career School during the 2000–2001 academic year. In the third semester of her junior year, she and her best friend, P.L., had a conversation with the defendant in the library of Career School in which the defendant told them "that since [they] were virgins [they] should have sex with someone around his age because, I guess, because they are more experienced at his age." The defendant "also said maybe a while later, that if [R.S. and P.L.] were to say anything about any of the conversations that [they] had, he wouldn't get in trouble because he has money, and . . . he was going to school, he has degrees and everything, so it wouldn't affect him." R.S. also testified that, on several occasions, the defendant had embraced her in a sexual manner when she encountered him in the hallways of Career School. For example, on one occasion, the defendant had wrapped his arms around R.S. and then "picked [her] up off the ground by holding [her] butt, behind." R.S. testified that it was "not a normal hug that you would give to somebody," that she "didn't like it at all." On at least four other occasions, the defendant had given R.S. hugs that she described as "kind of tight," in which he pressed his chest against her breasts, and his penis against her vagina. Although R.S. informed her mother and brother about the defendant's conduct, she did not notify officials at Career School.

Prior to the admission of R.S.'s testimony, the trial court gave the jury a limiting instruction. The court instructed the jury that it only could consider R.S.'s testimony to the extent that it found her testimony to be believable, and "that it logically, rationally and conclusively supported the issues for which it [had been offered]," namely, the defendant's alleged "common plan or scheme to sexually abuse high school-aged

girls."[20] The trial court reiterated this limiting instruction in its final charge to the jury.[21]

As previously explained, although evidence of prior misconduct generally is inadmissible "to prove that a criminal defendant is guilty of the crime of which the defendant is accused," it is admissible only if it is "so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime . . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant

[20] The trial court instructed the jury as follows: "Before we hear from the next witness, let me give you an instruction about this evidence that you are about to hear and consider.

"This evidence [that is] going to be offered by the state through the next witness concerns an assertion of prior acts of misconduct of the defendant. It is not being admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. This evidence is being offered solely to attempt to establish a common plan or scheme in the commission of criminal acts.

"You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity.

"You may consider such evidence, if you believe it, and further find that it logically, rationally and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issues of this assertion of a common plan or scheme to sexually abuse high school-aged girls.

"On the other hand, if you do not believe this evidence, or even if you do, if you find that it does not logically or rationally or conclusively support the issues it is being offered [to prove], namely this common plan or scheme, you should not consider this testimony for any purpose whatsoever."

[21] The trial court instructed the jury as follows: "Now, also in this case . . . the state presented evidence as uncharged misconduct, including evidence of other alleged sexual activity between the defendant and the two complainants, [P.L. and N.R.], and a third person, [R.S.]. I instruct you that all of this uncharged misconduct evidence has been admitted only for a limited purpose, that is, to show a common scheme or design by the defendant to have sexual contact with high school-aged girls, and you could consider it only for those purposes. This evidence is not admissible to prove the defendant's propensity to engage in certain conduct."

and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . .

"When evidence of other offenses is offered to show a common plan or design the marks which the uncharged and the charged offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other. . . . To guide this analysis, we have held that [e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan where the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness. . . . We are more liberal in admitting evidence of other criminal acts to show a common scheme or pattern in sex related crimes than other crimes." (Citations omitted; internal quotation marks omitted.) *State* v. *Aaron L.*, supra, 272 Conn. 820–21.

The defendant claims that his uncharged sexual misconduct with R.S. does not satisfy the second or third factors because it was less severe than his sexual misconduct with N.R. and P.L., and his relationship with R.S. was "vastly different than [his] alleged intimate and confidential relationships with N.R. and P.L."[22] We

[22] The defendant also claims that his relationship with R.S. was distinct from his relationship with N.R. and P.L. because R.S. "was never one of [his] students." We reject this claim. Although N.R. was a student in the defendant's Latin class during the 2000–2001 academic year, P.L. was not. Indeed, P.L. did not become a student of the defendant's until she enrolled in the Aspirations program in the summer of 2001. By the time the Aspirations program began, however, the defendant already had engaged in sexual misconduct with P.L. Accordingly, we conclude that the defendant's relationship with R.S. was similar to his relationships with N.R. and P.L. because he was a teacher at Career School where all three victims were enrolled in their junior year when the sexual misconduct first began.

are not persuaded. R.S., like both N.R. and P.L., was a female student enrolled in her junior year at Career School when the defendant's sexual misconduct took place. Thus, the defendant had unique access to, and was in a position of authority and control over, all three victims. See, e.g., *State* v. *Hauck*, supra, 172 Conn. 146 (student victims similarly situated because defendant teacher used "his position of authority to obtain or to seek to obtain sex-related favors in return for a passing grade in his science course"); *State* v. *Johnson*, 76 Conn. App. 410, 418, 819 A.2d 871 (victims similarly situated because defendant was in position of professional authority over them), cert. denied, 264 Conn. 912, 826 A.2d 1156 (2003). Moreover, the defendant's sexual misconduct with R.S. was similar to the initial stages of his sexual misconduct with both N.R. and P.L. At first, the defendant had intimate personal conversations with N.R. and P.L. in the library of Career School. Later, he began to embrace both victims more frequently, intimately and tightly when he encountered them in the hallways of Career School. Although the defendant's sexual misconduct with R.S. did not progress beyond this initial stage, the jury reasonably could have inferred from R.S.'s testimony that his misconduct ceased only after she rebuffed his sexual advances and reported his behavior to her mother and brother. Accordingly, contrary to the defendant's claim, the fact that R.S. suffered less severe sexual misconduct than N.R. and P.L. "does not illustrate a behavioral distinction of any significance." *State* v. *James G.*, supra, 268 Conn. 394; id. (common scheme or plan testimony by witness admissible when defendant's early abuse of witness was similar to abuse of victim); see also *State* v. *Kulmac*, 230 Conn. 43, 62–63, 644 A.2d 887 (1994) (same).

We next address whether the trial court improperly concluded that the probative value of R.S.'s testimony outweighed its prejudicial effect. "We consistently have

indicated that [t]he primary responsibility for . . . determin[ing] whether [prior misconduct] evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion. . . . Moreover, [w]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Romero*, 269 Conn. 481, 502, 849 A.2d 760 (2004).

In the present case, the state presented an offer of proof as to the anticipated testimony of R.S., and the trial court heard lengthy oral arguments from both the state and the defendant with respect to the probative value versus the prejudicial effect of this testimony. The court concluded that the "probative value . . . does exceed its prejudicial effect, principally on the basis of the fact that we're talking about alleged victims that are essentially identical to each other and in close time frame." Moreover, prior to the admission of R.S.'s testimony and again during its final charge, the trial court instructed the jury as to the limited purpose for which it could consider the evidence of the defendant's uncharged sexual misconduct with R.S. See footnotes 20 and 21 of this opinion. Although this evidence certainly carried with it some degree of prejudice, we are not persuaded that the trial court abused its discretion in concluding that its probative value outweighed its prejudicial effect. Accordingly, we conclude that the trial court did not abuse its discretion in admitting evi-

dence of the defendant's uncharged sexual misconduct with R.S. to establish a common scheme or plan.

## III

## CONSTANCY OF ACCUSATION TESTIMONY

Lastly, the defendant claims that the trial court improperly admitted the constancy of accusation testimony of S.C., A.D. and K.J.[23] because such testimony "serves no legitimate purpose in the case of a consensual sexual relationship between consenting adults, where the conduct is illegal solely due to the parties' relationship." Alternatively, the defendant claims that the trial court improperly admitted the constancy of accusation testimony of S.C. and K.J. because P.L. confided in both witnesses only after she had formed a

---

[23] The defendant also claims that the trial court improperly admitted "de facto" constancy of accusation testimony from P.L. in the case of N.R. and, likewise, from N.R. in the case of P.L. Moreover, the defendant claims that the trial court improperly admitted "de facto" constancy of accusation testimony from Gwendolyn Hampton, the assistant principal of Career School, who testified as to the circumstances surrounding N.R. and P.L.'s report to school officials of the defendant's sexual misconduct. The defendant failed to preserve these claims in the trial court and, therefore, seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See footnote 9 of this opinion. We recognize that a party may seek to prevail on unpreserved claims under the plain error doctrine; see Practice Book § 60-5; or, if the claims are constitutional in nature, under *Golding*, if the party affirmatively requests and adequately briefs his entitlement to such review in his main brief. See *Grimm* v. *Grimm*, 276 Conn. 377, 393 n.19, 886 A.2d 391 (2005) (plain error doctrine), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006); *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 532, 876 A.2d 1178 (2005) (*Golding* review). In the present case, however, the defendant failed to brief his entitlement either to *Golding* review or to plain error review in his main brief. Accordingly, we decline to review the defendant's claims because they are briefed inadequately. See *Grimm* v. *Grimm*, supra, 393–94 n.19 (declining to review claim under plain error doctrine because defendant had not sought plain error review until he filed reply brief); *Lebron* v. *Commissioner of Correction*, supra, 532 (declining to review constitutional claims under *Golding* because habeas petitioner had not briefed entitlement to *Golding* review until he filed reply brief).

plan to inform school authorities about the defendant's misconduct and, therefore, their testimony was akin to "postcomplaint" testimony. Finally, the defendant claims that the prejudicial effect of the constancy of accusation testimony adduced from all three witnesses outweighed its probative value.

The state responds that, because constancy of accusation testimony is admissible to establish the fact and timing of a sexual assault, and because sexual intercourse between a teacher and a student in these circumstances constitutes a sexual assault in violation of § 53a-71 (a) (8), the trial court properly permitted S.C., A.D. and K.J. to testify as constancy of accusation witnesses. The state further maintains that, because P.L. had confided in S.C. and K.J. before she filed an official complaint with the police, the trial court properly admitted their testimony. Lastly, the state claims that the trial court did not abuse its discretion in concluding that the probative value of the constancy of accusation testimony outweighed its prejudicial effect. We agree with the state.

The following additional facts are relevant to our resolution of the defendant's claim. Prior to trial, the defendant filed a motion in limine seeking to preclude the state from introducing any constancy of accusation testimony because, inter alia, "[t]he testimony of more than one constancy witness [would] be cumulative and unnecessarily prejudicial," and "[t]he historical rationale and policy reasons for permitting so-called 'constancy' testimony . . . to rebut an implication of 'recent fabrication' " are inapplicable to the present case because P.L. had informed most individuals "about her alleged sexual encounters with the defendant on or about the same day that she made those allegations

public at school." The trial court denied the defendant's motion.[24]

At trial, P.L. testified that she had had sexual intercourse with the defendant on numerous occasions between June 9 and October 24, 2001. She further testified that, during this time period, she had informed three individuals—S.C., A.D. and K.J.—about her sexual relationship with the defendant. Although P.L. had confided in A.D. throughout the summer and fall of 2001, she did not confide in K.J. or S.C. until sometime in mid-October after she and N.R. had resolved to confront the defendant and to inform officials at Career School about the defendant's sexual misconduct. On October 24, 2001, a few days after P.L. had confided in K.J. and S.C., N.R. and P.L. confronted the defendant and reported his sexual misconduct to school officials.

At the conclusion of P.L.'s testimony, the state moved, outside the presence of the jury, to introduce constancy of accusation testimony from S.C., A.D. and K.J. The defendant requested a preliminary hearing to determine whether the anticipated testimony of each witness satisfied the requirements of *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996), and *State* v. *Samuels*, 75 Conn. App. 671, 817 A.2d 719 (2003), rev'd on other grounds, 273 Conn. 541, 871 A.2d 1005 (2005). The trial court granted the defendant's request.

---

[24] On December 4, 2003, the trial court held a hearing on the defendant's motion in limine. After entertaining oral arguments from both parties, the trial court stated as follows: "Look, on the present state of the record, this motion in limine to exclude constancy evidence is denied. The court intends to adhere to the limitations of [*State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996)], and [*State* v. *Samuels*, 75 Conn. App. 671, 817 A.2d 719 (2003), rev'd on other grounds, 273 Conn. 541, 871 A.2d 1005 (2005)]. And, obviously, as to any piece of evidence, if the court determines that it is cumulative, or if the court determines that its prejudicial effect outweighs its probative value under our code of evidence, it is not admissible, so I'm not pre-judging those sorts of issues. But in terms of this claim asking that a—you know, an absolute prohibition of—of constancy evidence, that motion is denied."

At the preliminary hearing, S.C. testified that P.L. had informed him of her sexual relationship with the defendant "[t]hree or four days before she told the [school] administration." S.C. testified that P.L. told him that she had had sexual intercourse with the defendant "more than once," that the defendant had taken her "to some library, the Fairfield library," and that the two had gone jogging together throughout the summer. The defendant objected to the admission of S.C.'s testimony, claiming that it lacked specificity.[25] The trial court overruled the defendant's objection, and permitted S.C. to testify before the jury as a constancy of accusation witness. At the conclusion of S.C.'s testimony, the trial court gave the jury a limiting instruction, cautioning them that the evidence was admissible only to "corroborate the alleged victim's testimony" concerning the "fact and timing of the alleged victim's complaint."[26]

Thereafter, the jury was excused, and the trial court conducted a preliminary hearing concerning the admissibility of A.D.'s constancy of accusation testimony. A.D. testified that, commencing in May or June of 2001, P.L. began to confide in her that she was having a sexual relationship with the defendant. Specifically, P.L. told

[25] The defendant claimed that the testimony failed to identify the particular sexual acts in which the defendant and P.L. allegedly had engaged and, therefore, it was unclear whether P.L.'s statement constituted "a report of an incident of sexual assault."

[26] The trial court instructed the jury as follows: "Folks, I want to give you an instruction about this testimony that you just heard.

"Under our law here in Connecticut, a person, to whom an alleged sexual assault victim has reported the assault, is permitted to testify only with respect to the fact and timing of the alleged victim's complaint. This type of evidence is called constancy of accusation. And any testimony by such a witness is limited to those necessarily, simply to associate the complaint, the alleged victim's complaint to the pending charges.

"Now, this evidence that [S.C.] just gave us is totally subject to review by you whether you believe it or not in whole or in part. But it is admissible only to corroborate the alleged victim's testimony and not for any substantive purposes."

A.D. that she had engaged in oral and vaginal sexual intercourse with the defendant at various locations, including the Fairfield University Library and "near Whalley or Southern" where P.L. and the defendant often went jogging in the mornings. The defendant objected to the admission of A.D.'s testimony, claiming that it was cumulative in light of S.C.'s testimony. The trial court overruled the objection, and permitted A.D. to testify before the jury as a constancy of accusation witness. At the conclusion of A.D.'s testimony, the trial court reiterated its limiting instruction to the jury.[27]

Thereafter, the jury was excused, and the trial court conducted a preliminary hearing concerning the admissibility of K.J.'s constancy of accusation testimony. K.J. testified that P.L. had told her "a few days before she reported [the defendant's sexual misconduct]" that she had had sexual intercourse with the defendant on numerous occasions. Moreover, P.L. had told K.J. that she and the defendant often met in "libraries," and "at the park whenever she would go jogging near her house." The defendant objected to the admission of K.J.'s testimony, claiming that it lacked specificity. See footnote 25 of this opinion. The trial court overruled the defendant's objection, and permitted K.J. to testify before the jury as a constancy of accusation witness. At the conclusion of K.J.'s testimony, the trial court

---

[27] The trial court instructed the jury as follows: "Part of what [A.D.] testified to were statements that she said that [P.L.] had made to her about sexual relations between herself and the defendant, that, again, is . . . constancy of accusation evidence, and let me just read the instruction that I gave you before.

"A person to whom an alleged sexual assault victim has reported the assault, that person may testify only with respect to the fact and timing of the alleged complaint. And this evidence is called constancy of accusation.

"Any testimony by the witness regarding the details has to be limited to only those [necessary] to associate the victim's complaint or alleged victim's complaint with the pending charges. This evidence, that constancy of accusation evidence, is only admissible to corroborate the testimony of the complainant and is not offered for substantive purposes."

instructed the jury that "the same limitations that I told you about with respect to those other two witnesses apply to [K.J.'s] testimony as well." Moreover, in its final charge to the jury, the trial court reiterated its limiting instructions concerning the constancy of accusation testimony of S.C., A.D. and K.J.[28]

As a preliminary matter, we set forth the appropriate standard of review. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a

---

[28] The trial court instructed the jury as follows: "The state also offered testimony of out-of-court statements made by one of the complainants to other persons that the defendant sexually assaulted her. And those persons were [S.C., A.D. and K.J.]. Each of those persons testified as to statements the complainant made to each of them regarding the defendant sexually assaulting her.

"This evidence by each of these witnesses was admitted solely to corroborate or not corroborate the [complainant's] testimony in court, to be considered only by you in determining the weight and credibility you will accord her testimony given here in this court. The evidence of the out-of-court statements made by her of a sexual assault against her by the defendant is not to be considered by you to prove the truth of the matter asserted in those out-of-court statements.

"In determining whether these out-of-court statements are corroborative or not corroborative of her testimony in court, you should consider all the circumstances under which they were made, to whom, and whether the statements made to these people were or were not consistent with her testimony.

"If you find any delay in her reporting the alleged incidents, you may consider such delay, and any reasons which you find for such delay in evaluating her testimony given here in court.

"To the extent you find that what she has said outside the courtroom is consistent with her testimony in court, you may find her testimony in court to be corroborated or supported.

"To the extent that you find what she has said outside the courtroom is inconsistent with her testimony in court, you may consider the degree of inconsistency which you find, and you may consider the reasons which you find for the inconsistency in evaluating her testimony given here in court.

"Okay. On the issue of these so-called constancy of accusation witnesses. You should note, however, that the witness to whom she made her complaints under our law may only give sufficient details to establish if she told them of the complaints to which she has testified to."

showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Samuels*, 273 Conn. 541, 547, 871 A.2d 1005 (2005).

Before addressing the merits of the defendant's claims, we review the history and purpose of the constancy of accusation doctrine. The constancy of accusation doctrine "traces its roots to the 'fresh complaint' rule"; *State* v. *Troupe*, supra, 237 Conn. 294; "[t]he narrow purpose of [which] was to negate any inference that because the victim had failed to tell anyone that she had been [sexually assaulted], her later assertion of [sexual assault] could not be believed." (Internal quotation marks omitted.) Id., 296. "Because juries were allowed—sometimes even instructed—to draw negative inferences from the woman's failure to complain after an assault . . . the doctrine of fresh complaint evolved as a means of counterbalancing these negative inferences. Used in this way, the fresh complaint doctrine allowed the prosecutor to introduce, during the case-in-chief, evidence that the victim had complained soon after the [sexual assault]. Its use thereby forestalled the inference that the victim's silence was inconsistent with her present formal complaint of [assault]. . . . In other words, evidence admitted under this doctrine effectively served as anticipatory rebuttal, in that the doctrine often permitted the prosecutor to bolster the credibility of the victim before her credibility had first been attacked. . . . The fresh complaint doctrine thus constituted a rare exception to the common-law rule that prohibited rehabilitative evidence in the absence of an attack on the witness's credibility." (Citations omitted; internal quotation marks omitted.) Id.

In *State* v. *Troupe*, supra, 237 Conn. 303, we observed that the state and the victim both have a legitimate interest in "protect[ing] against the unwarranted, but nonetheless persistent, view that a sexual assault victim who does not report the crime cannot be trusted to

testify truthfully about the incident." On the other hand, we observed that "a defendant has an interest in not being unreasonably burdened by such accrediting or supporting evidence, which . . . generally is not admissible in the trial of crimes other than sexual assault." Id., 302. In light of these competing interests, we rejected the then existing rule that a person to whom a sexual assault victim had complained could provide substantive testimony with respect to the incident. See id., 303–304. Instead, we concluded that "a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator. In all other respects, our current rules remain in effect. Thus, such evidence is admissible only to corroborate the victim's testimony and not for substantive purposes. Before the evidence may be admitted, therefore, the victim must first have testified concerning the facts of the sexual assault and the identity of the person or persons to whom the incident was reported. In determining whether to permit such testimony, the trial court must balance the probative value of the evidence against any prejudice to the defendant.

"In addition, the defendant is entitled to an instruction that any delay by the victim in reporting the incident is a matter for the jury to consider in evaluating the weight of the victim's testimony." Id., 304–305; accord Conn. Code Evid. § 6-11 (c).[29]

---

[29] Section 6-11 (c) of the Connecticut Code of Evidence, which codified *Troupe*'s modification of the constancy of accusation rule, provides: "A person to whom a sexual assault victim has reported the alleged assault may testify that the allegation was made and when it was made, provided the victim has testified to the facts of the alleged assault and to the identity of the person or persons to whom the assault was reported. Any testimony

In light of the history and purpose of the constancy of accusation doctrine we further concluded, in *State* v. *Samuels,* supra, 273 Conn. 551–52, that statements made by a victim after he or she had filed an official complaint with the police were inadmissible as constancy of accusation evidence. In arriving at this conclusion, we reasoned that "[o]nce a sexual assault victim has reported the crime to the police . . . corroborative testimony by constancy witnesses that is based on post-complaint conversations with the victim, even if relevant, no longer serves the purpose of countering a negative inference as to the victim's credibility because it is the inconsistency between the victim's silence following the assault and her subsequent complaint to the police that gives rise to such an inference." Id.

With this background in mind, we now turn to the merits of the defendant's claims. The defendant first claims that the constancy of accusation doctrine is inapplicable to the present case because P.L. was over the age of consent and did, in fact, consent to sexual intercourse with the defendant. We reject this claim because, pursuant to § 53a-71 (a) (8), P.L. legally was incapable of consenting to sexual intercourse with the defendant. Just as a minor under the age of sixteen legally is incapable of consenting to sexual intercourse generally; see General Statutes § 53a-71 (a) (1); an elementary or secondary school student legally is incapable of consenting to sexual intercourse with a school employee who works in the school system in which the student is enrolled. See General Statutes § 53a-71 (a) (8); see also *State* v. *Russell,* 25 Conn. App. 243, 252, 594 A.2d 1000 ("[t]he statute proscribing sexual assault in the second degree has its origins in the desire of the state to prohibit

by the witness about details of the assault shall be limited to those details necessary to associate the victim's allegations with the pending charge. The testimony of the witness is admissible only to corroborate the victim's testimony and not for substantive purposes."

persons from engaging in sexual intercourse with individuals who are deemed legally incapable of consent"), cert. denied, 220 Conn. 911, 597 A.2d 338 (1991). To the extent that the defendant invites this court to draw a distinction between consent-in-fact and consent-in-law for purposes of the admission of constancy of accusation testimony, we decline to do so. Cf. *State* v. *Samuels*, supra, 273 Conn. 550 ("the fact that statutory rape differs from traditional rape because the underage victim may have consented to the act does not alter the requirement that the victim must report to the constancy witness that the act was of a sexual nature").

The defendant next claims that the trial court improperly permitted S.C. and K.J. to testify as constancy of accusation witnesses because P.L. had not confided in K.J. or S.C. until after she and N.R. decided to report the defendant's sexual misconduct to school authorities. In support of this claim, the defendant relies on *Samuels*, wherein we concluded that statements made by a victim after he or she had filed an official complaint with the police were inadmissible as constancy of accusation evidence. We determined that such statements do not counter the negative inference concerning the victim's credibility that may arise due to the victim's silence following the assault, but prior to her subsequent complaint to the police. Id., 552. In the present case, P.L.'s statements to S.C. and K.J. were made four or five days before P.L. reported the defendant's sexual misconduct to school authorities and filed an official complaint with the police. These statements therefore countered the negative inference that the jurors might have drawn about P.L.'s credibility based on the inconsistency between P.L.'s silence following the sexual assaults and her subsequent filing of an official complaint with the police. Accordingly, we conclude that the defendant's reliance on *Samuels* is misplaced.

Lastly, the defendant claims that the trial court abused its discretion in concluding that the probative value of the constancy of accusation testimony outweighed its prejudicial effect. We are not persuaded. Our review of the record reveals that S.C., A.D. and K.J. testified only as to the fact and timing of P.L.'s complaint and the details necessary to associate P.L.'s complaint with the charges against the defendant. Each of the three witnesses testified that P.L. said that she had had sexual intercourse with the defendant more than once at the Fairfield University Library and in the area in which P.L. and the defendant often went jogging.[30] Moreover, because each witness testified as to separate complaints made by P.L. on separate occasions, the trial court did not abuse its discretion in concluding that the constancy of accusation evidence was not prejudicially cumulative. See *State* v. *Parris*, 219 Conn. 283, 294, 592 A.2d 943 (1991) (constancy of accusation testimony of four witnesses not prejudicially cumulative because each witness testified with respect to "a different statement that the victim had made to a different person at a different point in time [and] therefore, the evidence covered new matter by demonstrating, as was its relevant purpose, that the victim previously had reported the incident she described on direct examination in a constant and consistent fashion"); *State* v. *Zoravali*, 34 Conn. App. 428, 441, 641 A.2d 796 (constancy of accusation testimony of seven witnesses not prejudicially cumulative because "all of the testimony pertained to different statements made by the victim to different people at different times"), cert. denied, 230 Conn. 906, 644 A.2d 921 (1994). Finally, the trial court instructed the jury repeatedly as to the

---

[30] Moreover, our review of the record reveals that the constancy of accusation testimony was not overly detailed or graphic in nature. Indeed, the defendant objected to the testimony of S.C. and K.J., claiming that it lacked sufficient detail concerning the precise sexual acts in which the defendant and P.L. allegedly had engaged. See footnote 25 of this opinion.

limited purpose for which the constancy of accusation evidence could be considered, thereby minimizing any risk of prejudice to the defendant. See *State* v. *Parris*, supra, 294 ("The [trial] court minimized any appreciable danger that the jury might treat [the constancy of accusation] testimony as substantive evidence by giving an appropriate instruction as to its limited corroborative use. The jury is presumed, in the absence of a fair indication to the contrary, to have followed the court's instructions."); see also footnotes 26, 27 and 28 of this opinion. Accordingly, we conclude that the trial court did not abuse its discretion in concluding that the probative value of the constancy of accusation testimony of S.C., A.D. and K.J. outweighed its prejudicial effect.

The judgment is affirmed.

In this opinion the other justices concurred.